626 F.2d 336
 104 L.R.R.M. (BNA) 2769, 89 Lab.Cas. P 12,303
 Harold E. BAGNALL, Donald Bauer, Kraig A. Hilbink, Roy A. C.
Hill, R. T. Kirchoff, Thomas D. Klemens, David LeBoutillier,
R. D. Longwish, Robert G. Maiers, William W. Neindorff, N.
J. Vasilaros, Richard L. Berry, Allan G. Sawatzky, Clyde B.
Smith, Appellants,
v.
AIR LINE PILOTS ASSOCIATION, INT'L, Trans World Airlines,
Inc., Northwest Airlines, Inc., Braniff
International Corp., Appellees.
 No. 78-1773.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 7, 1979.
Decided June 30, 1980.
 
 David T. Bryant, Springfield, Va. (Rex H. Reed, National Right to Work Legal Defense Foundation, Washington, D. C., on brief), for appellants.
 Gary Green, Washington, D. C., for appellees.
 Before HAYNSWORTH, Chief Judge, and WINTER and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Plaintiffs in these consolidated actions are fifteen airline pilots who sued their respective employers and the Air Line Pilots Association (ALPA), their exclusive bargaining representative, to obtain a declaratory judgment, an injunction and monetary relief based upon their contentions (a) that they are illegally being required to pay membership dues to ALPA based upon a percentage of their earnings, (b) that ALPA illegally exacts a finance charge from all members of the bargaining unit who elect not to pay membership dues annually in advance or monthly by means of an automatic payroll deduction, and (c) that ALPA, over plaintiffs' objection, has spent a part of the membership dues it has collected for purposes other than the costs of collective bargaining, contract administration, and grievance processing, and plaintiffs are entitled to recover this portion of what they have paid.[1] The district court granted summary judgment for defendants. We affirm in part and reverse in part.
 
 I.
 
 2
 The facts may be briefly stated: Plaintiffs are variously employees of Trans World Airlines (TWA), Northwest Airlines (Northwest), and Braniff International Corporation (Braniff). Plaintiffs are not members of ALPA.
 
 
 3
 ALPA has negotiated successive collective bargaining agreements with TWA, Northwest and Braniff, governing the wages, hours and working conditions of pilots employed by them irrespective of whether the pilots are members of ALPA or not. The current agreements require all pilots to become and remain members of ALPA, or, in lieu thereof, to pay an agency shop service charge equivalent to the dues normally required of members.
 
 
 4
 ALPA's constitution and by-laws provide that annual dues are due and payable by January 1 of each year. They are fixed at the rate of 1.35% of each covered employee's estimated airline income for the calendar year. If there is a variance between estimated and actual income, ALPA's treasurer makes an appropriate adjustment. Dues may be paid also by a monthly check-off through a member's employer where his employment agreement permits a check-off,[2] or they may be paid monthly directly to ALPA under ALPA's finance plan.[3] The latter option is a recent innovation. Prior to 1970, some members borrowed from a commercial bank to pay their annual dues on January 1 and repaid their bank loan, with a finance charge, over the course of the year. ALPA guaranteed such loans so that the bank gave a favorable interest rate. In 1970, after ALPA had acquired a computer and developed an appropriate internal billing system, it concluded to eliminate outside lenders and to handle the financing and collection of dues itself. It therefore created the option and fixed the finance charge at 1% per month on the unpaid balance.
 
 II.
 
 5
 Plaintiffs' contention that they are illegally being required to pay membership dues to ALPA based upon a percentage of their earnings is grounded on § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, as made applicable to airline pilots by 45 U.S.C. § 181. Section 152, Eleventh (a), permits an employer and a union to make closed-shop agreements with the limitation that:
 
 
 6
 (N)o such agreement shall require such condition of employment (i. e., membership in the union) . . . with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership. (Emphasis added.)
 
 
 7
 The language of § 152, Eleventh (a), is similar to § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3).[4] The purpose of enacting § 152, Eleventh, was to require non-union members who benefit from the collective bargaining conducted by the union to share equally with members the responsibilities incident to membership, i. e., to share equally in the expense of operating the union. See generally Legislative History of the Railway Labor Act, As Amended, 93d Cong. 2d Sess., 1970, pp. 1129, 1166, 1249-50, 1269.
 
 
 8
 Plaintiffs assert that membership dues based upon a percentage of earnings lack uniformity, and hence the requirement of "uniformity" contained in § 152, Eleventh (a), is not satisfied. To illustrate their argument, plaintiffs posit that a pilot earning $20,000 per year whose dues or agency shop service charge is computed at 1.35% of his earnings pays less than a pilot earning $35,000 per year whose dues or equivalent is computed at the same rate. Therefore, they assert, a disproportionate share of the cost of operating the union is placed upon the latter, all in violation of the language and purpose of the statute.
 
 
 9
 We do not agree. First, we note that the statute prescribes "uniformity" and not "equality." In essence, plaintiffs are arguing that the cost of operating the Union must be borne equally on a per capita basis. But this is not the law. In dealing with § 8(a)(3) of the National Labor Relations Act, which also prescribes the test of uniformity, the National Labor Relations Board has said:
 
 
 10
 (A) labor organization . . . may lawfully charge, as a condition of acquiring or retaining membership, different rates for initiation fees and dues provided that they are based on a reasonable general classification; that is, one that is not discriminatory. Thus, dues based on the employees' earnings have been held to be not discriminatory.
 
 
 11
 Aluminum Workers Trade Council, 185 NLRB, 69, 70 (1970) (citing Stage Employees & Motion Picture Operators Union, 140 NLRB 759 (1963)).
 
 
 12
 The assessment of dues based upon a percentage of earnings is, we think, a reasonable classification. Considering either his economic ability to pay or the benefits he realizes from effective representation, a pilot earning greater income has an advantage over a pilot earning less; there are reasons why he should or could pay more. There is uniformity in the basis of computing dues and there is lack of any indication of discrimination. Even if it is true, as plaintiffs suggest but do not prove, that non-members of ALPA earn more than members, there is no claim that ALPA adopted the percentage formula for discriminatory purposes.
 
 
 13
 Our view that dues based upon a percentage of earnings comports with the language and intent of § 152, Eleventh (a), is confirmed by Schwartz v. Associated Musicians of Greater N.Y., Local 802, 340 F.2d 228 (2d Cir. 1964). That case arose under the Labor Management Relations Act and the Labor Management Reporting and Disclosure Act, and it concerned a union's "local tax" of 11/2% upon sidemen on all engagements. The question was whether the tax was membership dues within the meaning of the Labor Management Relations Act and its provisions restricting payments to employee representatives. In answering affirmatively the court said:
 
 
 14
 (W)e can discern no practical or logical reason for holding that "membership dues" do not embrace the percentage levy exacted by the Local. The tax was similar to membership dues in that it applied equally to all members of the Union who secured employment as sidemen. The fact that payment was contingent upon employment did not mean that the tax was an irregular assessment that could not qualify as dues. . . . 340 F.2d at 234.
 
 
 15
 Thus, impliedly, the assessment of dues by a formula fixing the amount at a percentage of earnings was approved.
 
 
 16
 The authorities cited by plaintiffs do not persuade us to a contrary view. The decisions of the National Labor Relations Board on which plaintiffs rely all involved discrimination or lack of uniformity quite different from the disparity in the amount of dues paid by employees in the instant case as a result of the application of a uniform percentage factor. In short, these cases involved general classifications that were not reasonable. For example, in Electric Auto-Lite Co., 92 NLRB 1073 (1950), enforced, 196 F.2d 500 (6 Cir. 1952), the amount of dues payable was dependent upon whether a member attended union meetings. See also NLRB v. Leece-Neville Co., 330 F.2d 242 (6 Cir. 1964). Ferro Stamping & Mfg. Co., 93 NLRB 1459 (1951); Local 153, Int'l Union, 99 NLRB 1419 (1952); Food Machinery & Chemical Corp., 99 NLRB 1430 (1952); and Brewery Workers, Local 102, 116 NLRB 178 (1956), all concerned questions of whether it was discriminatory to charge old employees a higher initiation fee than new employees, or whether a first-time applicant for union membership can be charged a lesser amount than that charged a former member for reinstatement. A holding that some of these forms of discrimination were illegal provides no guidance for proper resolution of the issue that the instant case presents.
 
 
 17
 Similarly, we do not think that the holding in International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and its progeny barring the union's use of an employee's funds to support political causes which the employee opposes is of aid here now that that aspect of the instant case has been settled by partial refunds of dues by ALPA to plaintiffs. More significantly, Street held that while an employee may be entitled to an injunction against future like conduct and restitution of that portion of his funds which were illegally spent, the employee is not altogether relieved of his obligation to pay union dues. 367 U.S. at 771, 81 S.Ct. at 1801.
 
 III.
 
 18
 Under 45 U.S.C. § 152, Eleventh (a), any dues assessed not only must be "uniform" but also must be "periodic" and exclude "fines and penalties." Plaintiffs contend that the 1% finance charge levied on the unpaid balance of the monthly dues of those employees who choose to participate in the ALPA finance plan constitutes a penalty which is neither uniform nor periodic.
 
 
 19
 We do not directly consider whether this finance charge is authorized under the Act because the collective bargaining agreements in question do not authorize, and certainly do not require, the payment of dues through the ALPA finance plan.
 
 
 20
 A review of the collective bargaining agreements in question shows that all three authorize the payment of a service charge by non-members equal to the regular monthly dues. The collective bargaining agreement between ALPA and Braniff provides that each working pilot who does not voluntarily join the union must pay the ALPA a monthly service charge. That service charge "for the first month shall be an amount equal to the Association's regular and usual initiation fees and monthly dues, and for each month thereafter in an amount equal to the regular and usual monthly dues. . . ." The TWA agreement provides that non-member pilots shall pay a service charge which "for the first month and for each month thereafter shall be in an amount equal to the Association's regular and usual monthly dues uniformly required of the members of the Association. Except as provided in Section 3C (checkoff), payment shall be made on the fifteenth day of the month for which such service charge is payable. . . ." The Northwest agreement likewise provides for the payment of a service charge by non-member pilots. There, such a service charge shall be "a monthly amount equal to the Association's regular and usual monthly dues which would be required to be paid by such employees if a member, . . ."
 
 
 21
 None of these agreements, however, contain a provision for the ALPA finance plan. That plan is established by the ALPA Constitution and Bylaws. There, the ALPA establishes the three methods of payment monthly checkoff, annual payment in advance, and monthly payment to the association under its finance plan. Thus, ALPA has established a three option payment plan for those bound by its constitution and bylaws.
 
 
 22
 The plaintiffs are not members of the ALPA and therefore are not bound by the terms of its constitution and bylaws. While non-member pilots are bound to the terms and provisions of collective bargaining agreements, even though they do not belong to the union that negotiated the agreement, the union, however, cannot go a step further and bind those non-members to the union's own constitution and bylaws, not set out in the collective bargaining agreement. None of the collective bargaining agreements themselves authorize the exaction of annual dues, with an imposition of an interest charge if paid on a monthly basis. Therefore, such collection of annual, as opposed to monthly, dues from non-members of the union is unauthorized by these contracts.
 
 
 23
 These plaintiffs chose not to be members of the ALPA, and therefore should not be bound by its internal constitution and bylaws. We decline to read the terms of the ALPA's constitution and bylaws into the words "service charge" of the collective bargaining agreements. The collective bargaining agreements did not provide for payment of an amount equal to the amount a union member pays and paid by the method he pays. Rather, they provide for the payment of a "service charge" "in an amount equal to the regular and usual monthly dues." So long as the non-member pilot pays to the union the monthly requirement, whether by way of payroll check-off or otherwise, it is a matter of indifference how he comes by the money or the method of payment. The union is entitled to its monthly stipend, to be sure, but no more. Nothing in the collective bargaining agreement gives the union the right to regulate a non-member's method of payment. The non-member may not be required by the union to utilize the ALPA finance plan, thus the union may exact no penalty of non-members on this account nor collect a finance charge of them by compulsion. Accordingly, the only obligation of the non-member being to pay, the requirements of 45 U.S.C. § 152, Eleventh (a), are met in that the "periodic" monthly payments of a service charge equal to the dues of a member do not include "fines" or "penalties" for the union may not exact a finance charge under the terms of the collective bargaining agreement.IV.
 
 
 24
 We find no merit in ALPA's contention that plaintiffs have failed to exhaust their contractual or statutory remedies before litigating the validity of the charges in question.
 
 
 25
 Under the collective bargaining agreements in question, a pilot who has been discharged or threatened with discharge because of a delinquency in the payment of dues or service charges may request review of that decision.[5] Such review could ultimately entitle the pilot to a hearing before a neutral arbitrator chosen by the National Mediation Board. The decision of the arbitrator would be final and binding on all parties. During the pendency of a decision, discharge could not be completed.
 
 
 26
 We believe that such a remedy is tantamount to no remedy at all. The record does not show any contractual obligation in the collective bargaining agreements or otherwise to arbitrate any question as to the amount of dues other than incident to discharge. A pilot's only recourse in challenging the amount of dues owed would be to stop paying his dues until the Association requested that he be discharged or until he is discharged. At that point he could seek review under his collective bargaining agreement. If, however, he was not successful there, he would be discharged from employment. He would not have an opportunity to repay his delinquent dues which he had to incur in order to start the arbitration process in the first place. We do not consider such an alternative an effective remedy that would bar consideration of plaintiffs' claims. In all events, there is no obligation to arbitrate unless provided by contract. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), overruled on other grounds.
 
 
 27
 Defendants also assert that the plaintiffs are not entitled to relief because they have not brought their complaint to the Adjustment Board pursuant to the Railway Labor Act. It is well settled, however, that the Adjustment Board does not have jurisdiction to arbitrate disputes between an employee and his union representative.[6] The language of § 3, 45 U.S.C. § 153, is subject to no other interpretation.[7] It is likewise clear that federal courts have jurisdiction to decide disputes between employees and their union representatives where the union has been charged with violating its duty of fair representation.[8] Such is the case here. The only remaining question is whether the fact that the employer airlines are also defendants in this suit would deprive this court of jurisdiction to decide the issues here. We do not think so.
 
 
 28
 In Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court held that the federal courts were the proper forum for employee suits against their union for violation of its duty of fair representation. There, the employer railroad was not a party. The Court reasoned, however, that if it became necessary, the railroad could be joined as a party. 355 U.S. at 45, 78 S.Ct. at 101-102.
 
 
 29
 The Court concluded in Glover v. St. Louis-San Francisco Railway Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1968), that federal courts have jurisdiction over disputes that are essentially between employees and their union. There, a group of 13 employees had sued their union representative and the carrier, alleging claims of racial discrimination. Once again, the Court noted that the railroad adjustment board has exclusive jurisdiction to interpret the meaning of the terms of collective bargaining agreements.[9] But the Court further held that, while § 3 First (i), 45 U.S.C. § 153 First (i), by its own terms applies only to disputes between an employee or group of employees and their employer, federal courts do not lose their jurisdiction simply because the employer carrier is included in the lawsuit if the dispute is essentially one between employees on the one hand and the union and the employer together on the other.
 
 
 30
 In Czosek v. O'Mara, 397 U.S. 25, 28, 90 S.Ct. 770, 772, 25 L.Ed.2d 21 (1970), the Court again reaffirmed the holdings of Conley and Glover, noting that such a civil suit is "not within the jurisdiction of the National Railroad Adjustment Board or subject to the ordinary rule that administrative remedies should be exhausted before resort to the courts."
 
 
 31
 This circuit has dealt with this question in Rumbaugh v. Winifrede Railroad Co., 331 F.2d 530 (4th Cir. 1964). There, the plaintiff employee sued the railroad and his union representative alleging that the union had discriminated against him by refusing him membership, by failing to protect his employment rights and by having him wrongfully discharged. This court, adhering to the position of the Supreme Court in Conley restated that "the Adjustment Board does not have exclusive, or even concurrent, jurisdiction over suits by an employee against the bargaining agent to redress discriminatory treatment." Id. at 536. Quoting with approval Cunningham v. Erie Railroad, 266 F.2d 411, 416 (2d Cir. 1959), the court further stated:
 
 
 32
 "If the District Court has jurisdiction to proceed against the union it is clear, we think, that it has also power to adjudicate the claim against the railroad. It would be absurd to require this closely integrated dispute to be cut up into segments." 331 F.2d at 537.
 
 
 33
 Concluding that the controversy was primarily between the union and the employee and that the railroad was at best only incidentally a party to the action, the court ruled that jurisdiction did rest with the federal courts.
 
 
 34
 In Rumbaugh, defendant railroad also claimed that jurisdiction did not exist because interpretation of the collective bargaining agreement would likely be necessary for full resolution of the controversy. The court rejected that argument and further noted that the court was obligated to interpret the agreement. Without a federal forum to turn to, those plaintiffs would have had no other place to seek any sort of relief.
 
 
 35
 Citing Rumbaugh, in a case much like this one, concerning union dues, the Third Circuit held, in Brady v. Trans World Airlines, 401 F.2d 87 (3d Cir. 1968), that it had jurisdiction to consider plaintiff employee's suit against the union and the airline employer, even after the plaintiff had sought and was denied relief by the Adjustment Board. The employee there sued for violation of the union's duty of fair representation and violation of § 2, Eleventh, of the Act by his discharge from employment. A dispute had developed as to the exact amount of union dues plaintiff was required to pay, with the union contending that it had raised the dues while plaintiff claimed that the union did not follow correct procedure necessary to raise the amount. Plaintiff was eventually discharged by TWA at the union's request. In deciding the jurisdiction question, the court concluded:
 
 
 36
 That the employer was joined to afford complete relief and that the dispute may incidentally involve construction or interpretation of the collective bargaining agreement does not change the basic fact that the Railway Labor Act does not authorize adjustment boards to hear an employee's dispute against his union.
 
 
 37
 Id. at 93.
 
 
 38
 Here, the plaintiffs allege that ALPA has a duty to represent fairly both members and non-members within the bargaining unit. As non-members, they charge that they are being overcharged for dues and thus treated discriminatorily. Further, they claim that the amount of service charge and finance charge collected by the union from non-members violate § 2, Eleventh, of the Act, 45 U.S.C. § 152, Eleventh. We think jurisdiction over these claims has been properly alleged under 28 U.S.C. § 1337. We reject defendants' claim that these plaintiffs must exhaust their administrative remedies under the Act before bringing action in federal court.
 
 
 39
 Accordingly, we affirm that part of the judgment of the district court which approves the setting of a service charge (equal to union dues) as a percentage (1.35%) of pay. We reverse that part of the judgment of the district court which permits the union to require that non-members of the union pay their service charge (equal to dues) only by one of the same methods union members have subjected themselves to by their constitution and bylaws. On remand, the district court will enter its order enjoining the union from requiring the collection of the service charge from nonmembers by any particular method, specifically including, but not exclusively, the ALPA finance plan.
 
 
 40
 Each side in this appeal will bear its own costs.
 
 
 41
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*
 
 
 42
 WINTER, Circuit Judge, concurring and dissenting:
 
 
 43
 For the reasons that it assigns, I agree with the majority that § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, as made applicable to airline pilots by 45 U.S.C. § 181, does not render illegal the assessment of membership dues to ALPA by a formula based upon a percentage of their earnings. I disagree, however, that the 1% monthly finance charge levied on the unpaid balance of the monthly dues of those employees who choose to participate in the ALPA finance plan is not to be paid by non-members of ALPA who are covered by the several bargaining agreements. To that extent I respectfully dissent. Further, I do not think that the finance charge runs afoul of the statute because it constitutes a penalty. Certainly also, the finance charge is "periodic" and "uniform", as the statute requires.[1] Under my view of the case, I would not reach any question of the failure to exhaust contractual or statutory remedies.
 
 
 44
 The collective bargaining agreements all require the payment of a service charge by non-members of ALPA equal to the regular monthly dues. It is true, as the majority asserts, that the collective bargaining agreements do not authorize the exaction of annual dues with an imposition of an interest charge if paid on a monthly basis. But, the collective bargaining agreements by requiring a service charge equal to the regular monthly dues make, in effect, ALPA's constitution and bylaws with respect to the amount of dues and how the amount is affected by the time and manner of payment applicable to non-members.[2] In short, there is incorporation by reference.
 
 
 45
 Although ALPA's constitution and bylaws provide that annual dues and the equivalent agency shop service charge are payable annually in advance, there are two optional methods of payment: (1) the check-off where no interest is charged or finance charge imposed,[3] and (2) the ALPA finance plan where interest of 1% per month on the unpaid balance is charged. It must be stressed that these two options are precisely that options. No pilot is required to employ either, although there may be a strong economic compulsion to authorize a check-off. The lack of compulsion to use the ALPA finance plan where the finance charge is imposed robs the imposition of the charge of a large measure of the nature of a penalty. Simply stated, a penalty is usually suffered involuntarily, as a result of a default by the person upon whom the penalty is imposed; here, the alleged penalty is an obligation voluntarily assumed by the pilot electing this form of payment.
 
 
 46
 There are other factors which persuade me that the finance charge is not a penalty. When ALPA permits a pilot to defer payment of his annual dues or service charge, ALPA is deprived of the current use of the monies due it, and it is not unreasonable that it should be compensated for the use of its money so long as the rate of compensation is not disproportionate to that prevailing in the marketplace. I do not think that the current finance charge is disproportionate to the current market rate. Additionally, when it defers the payment of dues and there is no check-off, ALPA has other expenses such as billing and record keeping as amounts are paid, and it is not unreasonable that it make a charge to compensate itself for these operational costs. Of course, some of the same operational costs, including the use of its money, are sustained by ALPA when it permits a pilot to use a check-off without imposing a finance charge. But, when a pilot authorizes a check-off, it is obvious that ALPA's credit risk is markedly reduced. ALPA can look to the credit of the employer rather than that of the employee to insure future payment. It is assured that as a pilot earns compensation the proper percentage will be paid to ALPA. With this reduction of risk, I do not think it unreasonable for ALPA to fail to impose a finance charge on this kind of deferred payment. Certainly the fact that ALPA draws a distinction between the two options and requires a finance charge on one but not the other does not, in my view, convert the finance charge into a penalty.
 
 
 47
 Since I am persuaded that the finance charge is not in violation of the statute when it is imposed for ALPA finance-deferred payments, I would not consider ALPA's contention that plaintiffs have failed to exhaust their contractual or statutory remedies before litigating the validity of the charge. I would affirm the judgment of the district court in its entirety.
 
 
 
 [1]
 Since the decision in the district court, the parties have settled this aspect of plaintiffs' suit, and thus it is moot. We do not consider it on appeal
 
 
 [2]
 All three employment agreements involved in this case contain check-off provisions which are available, but are not mandatory, to both members and non-members of ALPA. The employment agreements in these cases do not permit the dues or service charge to be paid in a lump sum, annually, in advance. Neither do they forbid it. The subject is simply not mentioned. The record does not reflect whether ALPA would accept a lump sum payment if one were tendered
 
 
 [3]
 None of the employment agreements involved here contain any provision for the payment of dues through this finance plan. Indeed, they mention no method of payment except payroll check-off which is optional with each pilot
 
 
 [4]
 Section 158(a)(3) makes it an unfair labor practice for an employer to discriminate against an employee with respect to hire, tenure or any term or condition of employment to encourage or discourage membership in a labor organization. The section permits an employer to enter into a closed-shop agreement but specifies that an employer may not discriminate against an employee for non-membership in a labor organization:
 (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . (emphasis added).
 
 
 [5]
 No arbitration procedure can be initiated before either a threat of discharge or discharge itself has occurred. Both the Northwest agreement and the Braniff agreement provide such procedure for employees who are discharged because of delinquency in payment of dues. Under the TWA agreement, the procedure is available to those employees whose discharge has been requested by the union
 
 
 [6]
 Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Rumbaugh v. Winifrede Railroad Co., 331 F.2d 530 (4th Cir. 1964); Jones v. Trans World Airlines, 495 F.2d 790 (2d Cir. 1974)
 
 
 [7]
 45 U.S.C.A. § 153 First (i) states that the Adjustment Board has jurisdiction over "(t)he disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . ."
 
 
 [8]
 Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)
 
 
 [9]
 See Andrews v. Louisville & Nashville Railroad Co., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972)
 
 
 *
 The suits were dismissed against the carriers, and they seem to have been forgotten in the appeal by all sides. The real dispute, of course, is between the plaintiffs and the union
 
 
 [1]
 Consistent with the holding in Part II of the majority's opinion, it is obvious that the finance charge is "uniform". It is certainly "periodic" also because it is payable monthly on the unpaid balance of the annual dues
 
 
 [2]
 The majority implicitly concedes as much in Part II of its opinion because the formula for computing dues is contained in ALPA's constitution and bylaws and not in the collective bargaining agreements. I respectfully suggest a glaring inconsistency on the part of the majority when it looks to ALPA's internal documents to find out the amount of the service charge but turns a blind eye to the documents with reference to the amount as affected by the time and manner of payment
 
 
 [3]
 As the majority points out in n. 2 of its opinion, the check-off may be authorized by non-members of ALPA as well as members