**LOCAL UNION NO. 626 OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Plaintiff,**

v.

**DELAWARE CONTRACTORS ASSOCIATION, Inc., a Delaware corporation, Defendant.**

**Civ. A. No. 4241.**

United States District Court, D. Delaware.

June 21, 1972.

Harvey B. Rubenstein, Wilmington, Del., for plaintiff.

Daniel M. Kristol, of Killoran & Van Brunt, Wilmington, Del., and Vincent J. Apruzzese and Francis A. Mastro, Apruzzese & McDermott, Springfield, N. J., of counsel, for defendant.

## OPINION

LATCHUM, District Judge.

The complaint in this action seeks a declaratory judgment that the administration of the vacation plan of the plaintiff, Local Union No. 626 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("Local 626"), does not violate Section 302 of the Labor-Management Relations Act of 1947 as amended, 61 Stat. 157, 29 U.S.C. § 186, (the "Act"). The defendant, Delaware Contractors Association, Inc. ("DCA")[1] has counterclaimed seeking a declaratory judgment that the plaintiff's vacation plan does violate that section of the Act.

Jurisdiction exists by virtue of 29 U.S.C. § 185, 28 U.S.C. §§ 2201 and 2202.

In order to comprehend the nature of this controversy, it is necessary that the factual background of the vacation plan in question be discussed in some detail.

A vacation plan for members of Local 626 was first provided for in a collective bargaining agreement entered into between DCA and Local 626 for the period May 1, 1965 through April 30, 1969. Paragraph 18 of that agreement provided, in part: "On May 1, 1968, the wages of Journeyman members shall be increased by 25 cents, of which 15 cents wages shall be used and applied for Local 626 vacation plan at applicable wage rate."[2] In 1969, the parties entered into another collective bargaining agreement for the period from May 1, 1969 to April 30, 1971. Article VI, Section 5 of that agreement provided, in pertinent part: "The Employer agrees to deduct from Journeymen members' wages the sum of $.15 per each hour worked as a Vacation Fund, and such sums shall be

remitted as directed by Local 626 Vacation Plan."[3]

In 1971, during the course of negotiations for a collective bargaining agreement between Local 626 and DCA, DCA refused to agree to any contract provision requiring the deduction of monies from the wages of employees unless such deductions were forwarded to a vacation fund jointly administered by representatives of the union and the participating employers and which otherwise conformed in all respects to the requirements of 29 U.S.C. § 186. Local 626 took the position that the vacation plan as then administered did not violate the Act. Thereafter, in August, 1971, the parties entered into another collective bargaining agreement for a term which extended from May 1, 1971 to April 30, 1973. Article VII, Section 5 of the latter agreement provides: "Pursuant to the Memorandum of Understanding between the parties to this agreement dated August 17, 1971, relative to the question of making the vacation fund a trust fund, this question shall be settled by the respective counsel for the Union and for the employer. Upon official legal determination of this question, both the Union and the employer shall be bound by such determination."[4]

Counsel for the parties being unable to settle the question, this suit for declaratory relief followed.

On March 29, 1968, Local 626 entered into a separate agreement with Wilmington Savings Fund Society ("WSFS") for the administration of the vacation fund provided by the collective bargaining agreement running from May 1, 1965 to April 30, 1969.[5] The WSFS agreement provided that withdrawals by union members were to be

1. DCA is an association consisting of numerous member employers engaged in the construction industry within the State of Delaware and surrounding states.

2. Agreement United Brotherhood Of Carpenters And Joiners Of America, Local Union No. 626 (AFL–CIO) 1965–1969 (Docket Item 9).

3. Agreement United Brotherhood Of Carpenters And Joiners Of America, Local Union No. 626 (AFL–CIO) 1969–1971 (Docket Item 9).

4. Complaint, Paragraph 8, Docket Item 1.

5. Plaintiff's Tr. Ex. 1.

limited to one each calendar year and that any withdrawal could only be made upon presentation of the union member's most recent quarterly bank statement, together with his union book or his social security card. Additionally, the WSFS agreement contained an express disclaimer that it created a trust or that the bank was acting in any other capacity than as a mere depository for the funds; a service for which no charge was made. The 1968 WSFS agreement between Local 626 and WSFS was followed by another similar agreement, dated August 5, 1969.[6] This latter agreement, presently in force, is essentially the same as the 1968 agreement except that it permits withdrawals of funds by union members at quarterly intervals rather than once each calendar year.

The vacation fund is administered essentially as follows: as directed by Local 626, (1) the employer is required to list the names of his carpenter employees on a monthly remittance report which shows their social security numbers, the number of hours worked and the amount to be credited to the savings account of each listed employee;[7] (2) the employer is then required to forward the report to WSFS along with a check made out to "Carpenters Union Local 626 Vacation Fund" for the total amount payable by him to the fund;[8] (3) WSFS then credits to an interest bearing savings account in the name of each employee the appropriate amount shown on the employer's statement as to

that employee;[9] (4) WSFS then sends a receipt to the employer and a validated copy of the statement to Local 626; (5) a quarterly bank statement listing the transactions posted by WSFS to each individual employee's account during the calendar quarters ending March, June, September and December of each year is sent by WSFS to each employee respectively at the close of each quarter.

Section 302 of the Act provides, as a general prohibition, that "[i]t shall be unlawful for any employer or association of employers . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or any other thing of value —to any representative of any of his employees . . . or to any labor organization that represents his employees." By this broad proscription, Congress prohibited all payments to trust funds unless such funds were administered in conformity with the specific exceptions contained in the Act. Subsection (c) of Section 302 provides, in pertinent part, as follows:

"The provisions of this section shall not be applicable . . . . (6) with respect to money or other thing of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs: *Provided*, That the requirements of clause (B) of the proviso to clause (5) of this subsection shall apply to such trust funds;"[10]

---

6. Plaintiff's Tr. Ex. 2.

7. Tr. 21.

8. Tr. 21, 37.

9. The account of every employee is in the sole name of that employee and is separate from the account of every other employee. The original account is established for each employee only when WSFS has been supplied with a signature card bearing, among other things, the employee's signature and his social security number. The responsibility for seeing that the signature cards are executed by each employee apparently lies with the union. In some instances, how-

ever, these cards may not be returned by the union so that there might exist some accounts for which no signature card has ever been filed. (Tr. 35–37).

10. Clause (B) of the proviso to clause (5) of subsection (c) of Section 302 reads: "The detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the ad-

Local 626, conceding that the monies paid into the vacation fund are not administered in the manner prescribed by the above quoted provisions of the Act, contends that the general prohibition of Section 302(a) is not applicable to the present factual situation [11] because, stated briefly, (1) the employers involved are simply required to deduct money from the employee's wages and forward that money directly to the bank, (2) the money is deposited in separate employee accounts that belong exclusively to the individual employees, (3) the money is not paid over to any employee representative, and (4) the legislative history of Section 302 of the Act indicates that the statute did not intend to prohibit payments for wages.

The Court, however, is unable to agree with the plaintiff's characterization of the payment of the monies in question. While it is true that the Act does not prohibit the payment of wages in any particular manner, it is clear that no employer payment of wages may be made to any employee representative except in the specific manner provided in Section 302.[12] Thus, if the Court finds that the payments in this case are to an employee representative, it necessarily follows that the vacation fund obligated by the collective bargaining agreement is unlawful in view of the plaintiff's concession that the plan is not administered as required by Section 302.

For the reasons hereafter discussed the Court concludes that the payments involved in this litigation are made to an employee representative, and that the vacation fund as presently provided in the collective bargaining agreement violates Section 302 of the Act.

The evil or mischief which Congress sought to correct by enacting Section 302 was to keep large sums of employee-earned money out of the hands of union leaders where it could be subject to arbitrary control. It was feared that such funds in the sole control of union hierarchy would be subject to racketeering and arbitrary dispensation, and that "[w]ithout restraints employees would have no more rights in the funds supposedly established for their benefit than their union leaders [would] choose to allow them."[13] While in the instant case there is no evidence that there has been an abuse of the funds in question by Local 626, this is immaterial. "Section 302 is aimed primarily at the prevention of possible abuse and not at providing a remedy for abuse actually perpetrated." Employing Plasterers' Association of Chicago v. Journeymen Plasterers' Protective and Benevolent Society of Chicago, Local No. 5, 279 F.2d 92, 97 (C.A. 7, 1960).

Here the funds, which eventually make up the individual employee accounts, are being deducted from union

ministration of such fund and there is no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement."

11. Plaintiff concedes that the vacation fund is not maintained as a § 302(c) (5) (B) trust fund. (Pl.Reply Brief, p. 15, Docket Item 16).

12. The legislative history is quite clear on this point. It states: "By enacting a general prohibition on employer payments and then setting forth specific exceptions, Congress impliedly prohibited payments for any purpose not specifically excepted." U.S.Code Congressional and Administrative News, Vol. 1, p. 1160 (1969).

13. Senate Report No. 105 on S. 1126, Supplemental Views.

members' wages pursuant to a collective bargaining agreement that obligates DCA to remit such sums *"as directed by Local 626 Vacation Plan."* Local 626 is thus free to make any direction it so pleases. There is no requirement in the collective bargaining agreement that the funds deducted be deposited with WSFS or be handled in any other particular manner. The administration of the funds is left entirely to the direction of Local 626. The only reason that such sums are now handled in the manner described above is that Local 626, independent of DCA, entered into a separate contract with WSFS for the creation of individual vacation fund accounts. Testimony at trial was to the effect that if Local 626 notified the bank that it desired to discontinue the present arrangement the bank would follow such a request.[14] Furthermore, the Corporate Secretary and Resident Counsel of WSFS testified that he was unsure whether he would grant a request by a union member to withdraw funds between quarters to meet, for example, a medical emergency. If such a situation were to arise it appears that such a withdrawal could only occur with the consent of the union. Such was the opinion of the Assistant Business Agent and Recording Secretary for Local 626 who testified:

"Q. Suppose there is a hardship case when a Union member comes in and it is between quarters and the Union member has a sickness in the family or he needs money for some hardship or emergency reason; what usually happens in those situations?

"A. Well, we find out how much money the man has in his account from the bank, and if the bank says it's all right for him to withdraw, we give him a letter for withdrawal. And he has to take his Union card and book or Social Security card with his signature. The bank usually—sometimes it don't, but usually they let him have his money if it's in the account under his name."[15]

These facts lead the Court to conclude that the vacation fund, as presently conceived and administered, is in the complete control of Local 626. This is precisely the result that Congress sought to prohibit by Section 302. The Court perceives no difference between a collective bargaining agreement obligating an employer to deduct certain sums from union members' wages for a "General Welfare Fund" to be used as a union directs and the collective bargaining agreement here involved obligating DCA to deduct certain sums from union members' wages and to remit them solely *"as directed by Local 626 Vacation Plan."*[16]

■ Nevertheless, Local 626 seeks to escape this conclusion by asserting that the payments to WSFS are not to an employee representative, thereby making Section 302(a) of the Act inapplicable. To accept that argument would require the Court to ignore the realities of the case.

■ In United States v. Ryan, 350 U.S. 299, 302, 304, 76 S.Ct. 400, 403, 100

14. Tr. 95.

15. Tr. 133.

16. It is of no consequence to the decision of this Court that the union members of Local 626 authorized the collective bargaining agreements providing for the vacation plan in question. The essential purpose of the Act is to keep such large sums of employee earned money out of the sole control of union officials. Once the agreements were approved the day-to-day control over the fund rested solely with union leadership, the exact end the Act seeks to eschew. Furthermore, the Court notes that the case of Independent Association of Mutual Employees of New York State v. The New York Racing Association, 398 F.2d 587 (C.A. 2, 1968) has no application to the facts of this case. In that case the welfare or trust fund was established by the employer under a plan which made it impossible for the representative of the employees who participated in the administration of the plan to use any funds as they saw fit, or to authorize any use of the funds without the employer's consent. The dangers the Act sought to restrict were not present. This is not true in this case.

L.Ed. 335 (1956), the Supreme Court held that in "using the term 'representative' Congress intended that it include any person authorized by the employees to act for them in dealings with their employers." In reaching that conclusion the Court went on to say that "a narrow reading of the term 'representative' would substantially defeat the congressional purpose" behind the Act. That reasoning applied to the present case compels this Court to hold that the funds DCA pays to WSFS are, in reality, payments to an employee representative. Considering the separate contractual arrangement between Local 626 and WSFS and the control exercised by the union over that agreement, it is readily apparent that WSFS is simply the alter ego of Local 626. While the Court agrees that Congress did not intend to prohibit an employer from forwarding part of an employee's wages directly to a bank to be credited to a savings account established by the employee, Congress did intend to prohibit the payment of funds in the manner presently before the Court. Here the funds paid by DCA are remitted pursuant to the collective bargaining agreement *"as directed by Local 626 Vacation Plan."* The union, the primary employee representative, determines where the money goes and how it is to be administered. The union made the independent contract with WSFS. To find, under these circumstances, that the payment of funds to WSFS is not in actuality payment to an employee representative, would be to undermine the Congressional purpose of the Act and to permit a circumvention of the law. This the Court refuses to do. Under the present circumstances the Court concludes that the vacation plan as provided in the collective bargaining agreement violates Section 302(a) of the Act.

Accordingly, the Court denies Local 626's request for a declaratory judgment in its favor and enters a favorable judgment on DCA's counterclaim.

Submit order.