**ASSOCIATED BUILDERS & CONTRACTORS et al., Plaintiffs-Appellants,**

v.

**CARPENTERS VACATION AND HOLIDAY TRUST FUND FOR NORTHERN CALIFORNIA et al., Defendants-Appellees.**

Nos. 81–4122, 81–4359 and 81–4687.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1982.

Decided March 10, 1983.

Mark R. Thierman, San Francisco, Cal., for plaintiffs-appellants.

Victor J. Van Bourg, Van Bourg, Allen, Weinberg & Roger, Thomas E. Stanton, Johnson & Stanton, San Francisco, Cal., for defendants-appellees.

Before DUNIWAY, FLETCHER, and BOOCHEVER, Circuit Judges.

FLETCHER, Circuit Judge:

This is an appeal from a summary judgment for defendants in an action challenging a dues check-off provision in a collective bargaining agreement between the United Brotherhood of Carpenters and Joiners (the Union) and various employers engaged in the construction industry. The plaintiffs, an employer organization known as Associated Builders & Contractors (ABC) and several ABC members, brought the action on behalf of all member employers who transfer dues to the Union pursuant to the check-off provision. They contend that the dues check-off procedure violates the provisions of the Labor Management Relations Act (LMRA) and the Employment Retirement Income Security Act (ERISA). We have jurisdiction under 28 U.S.C. § 1291 (1976) and affirm.

I

## FACTS

ABC brought this action on July 14, 1980. At that time, the 46 Northern California Counties Carpenters Agreement (the 1978 Master Agreement) required employers to contribute vacation and holiday benefits to the Carpenters Vacation and Holiday Trust Fund of Northern California (Trust Fund), that funded an employee welfare benefit plan established by the parties to the 1978 Master Agreement. The amounts contributed for each employee were calculated according to the numbers of hours worked. By the terms of the 1978 Master Agreement, the contributions were deemed additional compensation.

The 1978 Master Agreement included a union security clause that required employees to be Union members in good standing in order to retain their jobs. For each hour worked, an employee was assessed supplemental union dues of ten cents. The agreement allowed an employee to authorize the trustees to deduct assessed supplemental dues from the employee's vacation and holiday benefits account. For each employee who signed a card authorizing the deduc-

tion, the trustees of the Trust Fund remitted to the Union a monthly payment of supplemental dues. The trustees distributed the remaining funds in the vacation and holiday account of each employee to the employee on an annual basis.[1]

Contending that the payment of union dues out of the Trust Fund violated section 302 of the LMRA and sections 403, 404, and 406 of the ERISA, ABC sued the Trust Fund, the Fund's trustees, and the Union. ABC sought to have the Union return to the employers or, alternatively, to the Trust Fund all supplemental dues transferred under the check-off procedure of the 1978 Master Agreement. ABC also sought a preliminary injunction restraining the trustees from paying any further monies to the Union under the check-off procedure. The district court denied the motion for preliminary relief and ABC's motion for reconsideration.

In 1980, the parties to the 1978 Master Agreement agreed to a modified collective bargaining agreement (the 1981 Master Agreement) in an attempt to remedy the alleged defects.[2] Under the 1981 Master

1. Section 43–A of the 1978 Master Agreement provided:

Effective for all work performed on and after January 1, 1978, it is agreed that upon written authorization, provided by the Union, as required by law, the amount of ten cents (10¢) per hour, for each hour paid for or worked, shall be deducted from the Vacation and Holiday benefit of each workman and remitted directly to the Union, or the appropriate Local Union or District Council of the Union, as the Union may from time to time direct. The amount of the deduction shall be specified on a statement transmitted to the workmen. Such remittance shall be made to the Union not less than twelve (12) times per year.

Section 11 of Article V of the Trust Agreement adopted by the parties to the 1978 Master Agreement provided:

Notwithstanding any other provision of this Trust Agreement to the contrary, the Board of Trustees is authorized, and is hereby expressly directed by the parties hereto, to deduct the amount specified in Section 43–A of the Carpenters 46 Northern Counties Master Agreements ... from the undisbursed vacation and holiday benefits of each employee who executes a voluntary dues authorization therefor as required by law, for all hours paid for or worked by such employee on and after January 1, 1978, under any of such agreements, and to remit said amount directly to the Union, or to the appropriate District Council or Local Union as the Union may direct, not less than 12 times per year commencing on and after June 1, 1978, as supplemental membership dues of such employee. The Union shall provide the Board of Trustees with a receipt for each such remittance signed by its Executive Officer, and the Fund shall send each employee from whose benefits a deduction has been made a quarterly statement specifying the amount of such deduction. The Union shall exonerate, reimburse and save harmless the Fund, the Board of Trustees and the Trustees, individually and collectively, against any and all liabilities and reasonable expenses arising out of any such deduction or remittance.

The voluntary dues authorization under the 1978 Master Agreement was in the following form:

AUTHORIZATION FOR CHECK–OFF

I hereby authorize the Carpenters Vacation-Holiday Trust Fund for Northern California to deduct the amount specified in Section 43–A of the Carpenters Master Agreement ... from my undisbursed Vacation-Holiday benefit for all hours paid for or worked by me on or after January 1, 1978, and remit said amount directly to the Carpenters 46 Northern California Counties Conference Board or to the appropriate District Council or Local Union as said Conference Board may direct as supplemental work dues. This authorization may be revoked by me, in writing to the Trust Fund, within the 30 day period prior to the expiration of said Master Agreement ... or one year from the date hereof whichever is sooner. If not revoked, this authorization shall be deemed as renewed from year to year thereafter.

Signature _____ Date signed _____
Social Security No. _____ Local Union No. __

2. Section 43–A of the 1981 Master Agreement provides:

Effective for all work performed on and after January 1, 1981, ... the amount covered by the Supplemental Dues option in connection with the Vacation and Holiday contribution, amounting to a total of twenty-five cents (25¢) per hour, shall be remitted by the individual employer as follows:

(1) The individual employer shall include such amount in the single check mailed with his combined employer report of contributions to the Depository Bank for the Northern California Carpenters Trust Funds.

(2) In such report the individual employer shall designate the Depository Bank as his or its agent to receive written dues authorizations from employees covered by this Agreement pursuant to Section 302(c)(4) of the

Agreement, supplemental dues are assessed against each employee at the rate of twenty-five cents per hour worked. Every month, each employer sends a check in an amount equal to the total supplemental dues assessed against all employees working for that employer during that month to the employer's designated agent, Lloyds Bank of California (Lloyds). For each employee's paycheck, the amount remitted to Lloyds as supplemental dues for that employee is deducted from total taxable wages. Lloyds deposits the monies remitted by the employer as supplemental dues in a special

Labor-Management Relations Act, as amended, and any revocation of such authorizations, and shall direct the Bank (a) to deposit the monies reported under the column headed Supplemental Dues (Column B) in a special account, (b) to transfer monthly from such account the monies paid with respect to the work of each employee who has on file with the Bank an unrevoked dues authorization in a form complying with law to the account of the Union as supplemental dues and (c) to transfer the remaining monies in said account to the Carpenters Vacation and Holiday Trust Fund for Northern California for credit to the vacation and holiday accounts of the other employees. Any delinquency in the payment of such amount shall be subject to the same liquidated damage, interest and other delinquency provisions applicable to contributions to the Northern California Carpenter Funds.

The dues authorization form was revised to read:

#### Authorization
#### For Supplemental Dues Check-Off

I hereby authorize all individual employers, individually and collectively, to deduct the amount specified in Section 43–A of the Carpenters Master Agreement ... from my wages for hours paid for or worked by me on or after January 1, 1981, and remit said amount directly to the Carpenters 46 Northern California Counties Conference Board or to the appropriate District Council or Local Union as said Conference Board may direct as supplemental dues. This authorization may be revoked by me in writing to Lloyds Bank California, as the agent for this purpose of the individual employer at P. O. Box 45930, Rincon Annex, San Francisco, California 94145, within the 30-day period prior to the expiration of said Master Agreement ... or one year from the date hereof whichever is sooner. If not revoked, this authorization shall be deemed as renewed from year to year thereafter.

account. Once a month, the bank transfers the monies from the account in part to the Union (for payment of supplemental dues), and in part to the Trust Fund (for payment of additional vacation and holiday benefits), based on an allocation between monies designated as supplemental dues by employees and monies as to which there is no outstanding check-off authorization.[3]

After the 1981 Master Agreement was signed, the district court granted summary judgment to the defendants on the ground that the modification had mooted ABC's claims of invalidity of the check-off proce-

| Name | SS No. | Local Union No. |
|---|---|---|
| Signature | Date | |

The form that the individual employer used to remit payments required by the 1981 Master Agreement was revised to include the following certification:

By submitting this report the above-named employer certifies the following: ... (5) that depository bank is designated by the employer as his or its agent to receive written dues authorizations from such employees pursuant to Section 302(c)(4) of the LMRA, and any revocations of such authorizations; (6) that said bank is directed by the employer (a) to deposit the monies reported herein under Vacation and Holiday—Column B—Supplemental Dues in a special account, (b) to transfer monthly from such account the monies paid with respect to the work of each employee who has on file with the bank an unrevoked dues authorization in a form complying with law to the account of the Carpenters 46 Northern California Counties Conference Board as supplemental dues and (c) to transfer the remaining monies to the Carpenters Vacation and Holiday Trust Fund for Northern California for credit to the Vacation and Holiday accounts of the other employees ....

| Date | Signature | Title |
|---|---|---|

3. For each employee who has authorized a check-off of dues, the Union receives a monthly disbursement from Lloyds in payment of supplemental dues for all work performed that month by that employee for all employers. Conversely, for each employee who has not authorized a check-off, the bank transfers the amount previously designated as "supplemental dues" to the Trust Fund for credit to the employee's vacation and holiday benefits account. The Union must obtain the supplemental dues owed by that employee in some other manner.

dure under the 1978 Master Agreement. ABC appeals both from this judgment and from the earlier orders denying ABC's motions for preliminary relief. ABC contends that the modification did not cure the alleged violations of section 302 of the LMRA and the ERISA provisions.

The district court's denial of preliminary relief and refusal to reconsider that denial have merged into the final order disposing of the action. *See SEC v. Mt. Vernon Memorial Park,* 664 F.2d 1358, 1361–62 (9th Cir.), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982). We therefore dismiss ABC's two interlocutory appeals (Nos. 81–4122 and 81–4359) and consider only the appeal from the final judgment (No. 81–4687).

## II

## SECTION 302

Section 302 of the LMRA, 29 U.S.C. § 186 (1976), prohibits an employer from paying any monies to a union and fortifies that prohibition with criminal sanctions. Section 302(c)(4) of the Act establishes one of several exceptions to that prohibition for payments from employer to union that constitute

money deducted from the wages of employees in payment of membership dues

in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.

29 U.S.C. § 186(c)(4) (Supp. II 1978). Thus, the LMRA permits an employer to transfer money to a union if: (1) the money is in payment of membership dues; (2) the employer has received a valid written authorization from the employee; *and* (3) the money is deducted from wages.

█ ABC contends that, under the terms of the 1981 Master Agreement, transfers of "supplemental dues" monies by Lloyds to the Union in effect constitute payments by the employers to the Union in violation of section 302 since the payments to the Union originate in funds transferred by the employer to Lloyds and since the requirements set forth in section 302(c)(4) are not met. ABC urges us to overturn the summary judgment granted below and to grant declaratory and injunctive relief forbidding further transfers from Lloyds to the Union.[4] We reject the argument and uphold the dues check-off procedure under the 1981 Master Agreement.[5]

4. Since the 1978 Master Agreement has now been modified in an attempt to correct prior defects and since there is no showing that either the Union or ABC or any employers intend to reinstitute the earlier procedures, we review the denial of ABC's request for injunctive and declaratory relief solely in regard to the propriety of the 1981 Master Agreement. *See, e.g., County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

5. At various points in the proceedings below, ABC contended that the Union should be required to return to ABC member employers or to the Trust Fund monies received under the 1978 and 1981 Master Agreements in violation of § 302 of the LMRA. We need not reach these claims on this appeal, however.

ABC's request that the Union be ordered to return to ABC member employers monies unlawfully received by the Union must be denied. As to monies received under the 1981 Master Agreement, our conclusion *infra* that the procedures thereunder comply fully with the § 302(c)(4) exception make such relief unnec-

essary. As to monies received by the Union under the 1978 Master Agreement, even assuming *arguendo* that such payments were unlawful under § 302, only the Trust Fund or its employee beneficiaries—and not ABC or its member employers—are entitled to a return of those monies. Designated by the employer as vacation and holiday benefits compensation and transferred to the Trust Fund before being sent to the Union, such monies, even if not properly transferable by the Trust Fund to the Union as "supplemental dues," certainly could not be returned to the employer. Such a transfer would violate the terms of the trust agreement between the parties, which provides: "No Individual Employer shall have any right, title or interest in such payments, [i.e., contributions to the Fund designated as vacation holiday and benefits,] or any part thereof, and no part thereof shall revert to any such Individual Employer."

ABC's request that the Union be ordered to return to the Trust Fund monies unlawfully received by the Union must also be denied on

## A. Membership Dues.

ABC argues first that the monies transferred to the Union as "supplemental dues" are not in payment of "membership dues" because the Union uses part of the revenues from such supplemental dues for "political" purposes, that is, to hire organizers to combat the "open shop" movement in the California construction industry and to discourage employers from going non-union. ABC contends that since "membership dues" cannot be expended for political purposes, the money deducted here is not "in payment of membership dues" and thus Lloyds is prohibited by section 302(c)(4) from transferring such monies to the Union. We disagree.

■ Where federal or state law authorizes a union security agreement (an agreement that conditions an employee's continued employment on the payment of union dues), the first and fourteenth amendments prohibit a union from expending an employee's membership dues for political causes, over the employee's objection. *Abood v. Detroit Board of Education,* 431 U.S. 209, 235–36, 97 S.Ct. 1782, 1799–800, 52 L.Ed.2d 261 (1977) (Michigan labor law); *Ellis v. Brotherhood of Railway Clerks,* 685 F.2d 1065, 1067 (9th Cir.1982) (Railway Labor Act); *Seay v. McDonnell Douglas Corp.,* 427 F.2d 996, 1003 (9th Cir.1970) (LMRA).

■ A union's expenditure of dues revenue for political goals is not proscribed by the first amendment, however, unless the employee from whom the dues are exacted affirmatively objects to the expenditure. *See Abood,* 431 U.S. at 236, 241, 97 S.Ct. at 1800, 1802. Here, there is no suggestion that any employee objects to the use of his supplemental dues to hire union organizers.

■ Furthermore, an expenditure is considered "political" for purposes of first amendment analysis only if it is not germane to the union's work in the realm of collective bargaining. *Ellis,* 685 F.2d at 1072–73. Money spent on organizing to eliminate competition from non-union employers is germane to collective bargaining and therefore is not a "political" expenditure for purposes of first amendment analysis. *Id.* at 1074.

■ For these reasons, we reject ABC's contention that the monies collected here and transferred to the Union are outside the scope of compulsory "membership dues" permitted by the first amendment. Thus, even assuming that a union's violation of the first amendment proscriptions would transform payments by the employer into something other than membership dues, no such violation has been shown here.[6]

this appeal. While ABC's amended complaint requested the Union to return to the Trust Fund monies received by the Union in violation of section 302, ABC never pressed that claim for relief in district court. When defendants moved for dismissal or summary judgment on the ground that the changes in procedure embodied in the 1981 Master Agreement "mooted" plaintiffs' claims for relief, ABC defended the continuing "live" nature of its claim solely on the ground that even if the court were to find the pre-1981 defects remedied by the procedures set forth in the 1981 Master Agreement, plaintiffs' claim for damages and the "return [to the employers] of all monies contributed to the trust fund from January 1, 1978" onward remained justiciable:

Even if defendant could convince the court that it is now complying with section 302 and with respect to these Plaintiffs, Plaintiffs are still seeking the reimbursement of monies up until the date of compliance.

Both the Trust Fund defendant and the district court asserted that the employers' claim for reimbursement for monies paid under the 1978 Master Agreement was "inconceivable," yet plaintiffs never responded that a return of monies to the Trust Fund—and not to the employers—was the desired relief. In view of ABC's abandonment below of its claim for the return of monies to the Trust Fund and in light of the failure of the Trust Fund and its trustees, both parties to this action, to assert such a request for relief on appeal, we decline to address that claim here. We address neither ABC's standing to raise such a claim on behalf of the Trust Fund nor the propriety of a return of such pre-1981 Master Agreement payments to the Trust Fund.

6. ABC also argues that the supplemental dues are not "membership dues" because the obligation to pay the supplemental dues is imposed not on all members but only on those Union members who find employment as carpenters. ABC assumes that in order to constitute "membership dues" under § 302(c)(4), the supplemental dues must qualify as "periodic dues and

B. *Valid Written Authorization.*

Section 302(c)(4) allows dues check-offs only if "the employer has *received* from each employee, on whose account such deductions are made, a [valid] written assignment." 29 U.S.C. § 186(c)(4) (emphasis added). ABC contends that the check-off provision of the 1981 Master Agreement is invalid because the individual employers do not receive the dues check-off authorization cards. Instead, each employer appoints a common intermediary (Lloyds) as its agent to receive the authorization cards from its employees and to deduct monies pursuant to such authorizations on behalf of the employer.

■ Nothing in the language of the Act proscribes an employer's appointing an agent for this purpose. Indeed, the statutory definition of "employer" includes "any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. § 152(2) (1976).

Moreover, the purpose of requiring an employer to receive authorization is to prohibit the deductions of dues without an employee's consent. *See* 93 Cong.Rec. 4876 (1947) (statement of Sen. Taft), *reprinted in* 2 NLRB, *Legislative History of the Labor Management Relations Act, 1947,* at 1311 (1948). In construing the dues check-off provision of section 2, Eleventh (b) of the Railway Labor Act, which is very similar to section 302(c)(4) in both language [7] and legislative intent, *see Felter v. Southern Pacific Co.,* 359 U.S. 326, 332 n. 10, 79 S.Ct. 847, 853 n. 10, 3 L.Ed.2d 854 (1959), the Supreme

Court stated that employers and unions have considerable latitude to set up procedures for processing individual authorizations and revocations of check-offs, as long as the procedures do not infringe upon the employee's freedom to revoke the check-off. *Id.* at 333–35, 79 S.Ct. at 853–54. The Court noted that employers may make reasonable designations of agents to whom revocations may be sent. *Id.* at 335, 79 S.Ct. at 854 (dictum).

In this case, the provision in the 1981 Master Agreement permitting an employer to designate a bank as its agent to receive authorizations and revocations is a reasonable adaptation of the requirements of section 302(c)(4) to the transitory nature of employment in the construction industry. A contractual requirement that each employee must send authorizations and revocations directly to each of the employee's employers would be impractical because an employee ordinarily works for several different employers during the course of a year.

Contrary to ABC's assertion, the procedures under the 1981 Master Agreement do not restrict an employee's right to revoke a check-off authorization. ABC asserts that a single card used for all employers effectively denies an employee the right to revoke the check-off at the time he changes employers. Section 302(c)(4), however, does not require that an employee be free to revoke the check-off whenever he changes employers. Rather, section 302(c)(4) re-

---

... initiation fees uniformly required as a condition of acquiring or retaining membership" under § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1976). The supplemental dues, ABC argues, are not uniformly required because they are not imposed on all Union members.

We do not agree. Assuming *arguendo* that § 302(c)(4) "membership dues" must be "uniformly required" within the meaning of § 8(a)(3), *but see UMW Local 515 v. American Zinc, Lead & Smelting Co.,* 311 F.2d 656, 659–60 (9th Cir.1963), a dues structure that bases the amount of compulsory dues on the size of an employee's earnings nonetheless meets the uniformity requirement of § 8(a)(3), *see Aluminum Workers Trades Council,* 185 N.L.R.B. 69,

70 (1970); *cf. Bagnall v. Air Line Pilots Ass'n,* 626 F.2d 336, 339–40 (4th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 943, 67 L.Ed.2d 112 (1981) (construing § 2, Eleventh of the Railway Labor Act). *See also Schwartz v. Associated Musicians, Local 802,* 340 F.2d 228, 233–34 (2d Cir.1964) (monies collected from 1½% levy on all members' earnings deemed "membership dues" within § 302(c)(4)).

7. Section 2, Eleventh (b) provides that an employee's authorization for a dues check-off "shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective bargaining agreement, whichever occurs sooner." 45 U.S.C. § 152, subd. 11(b) (1978).

quires only that, for any dues deducted from an employee's wages pursuant to that provision, the employer paying those wages must have received an authorization from the employee that is not irrevocable for longer than a year, regardless of how many employers the authorization covers. Since each authorization signed by an employee in this case expressly authorizes "all individual employers" who were parties to the 1981 Master Agreement to deduct supplemental dues, the check-off provision in the 1981 Master Agreement satisfies this requirement.

## C. Deduction from Wages.

ABC contends finally that the transfer of "supplemental dues" monies from Lloyds to the Union violates section 302(c)(4) of the Act since those payments are deducted not from "wages" but from a commingled fund of dues and fringe benefits held by Lloyds. ABC argues that since some of those monies transferred from the employers to Lloyds are in turn transferred to the Trust Fund and used for the purpose of vacation and holiday benefits pursuant to section 302(c)(6) of the Act,[8] the supplemental dues are in effect commingled with Trust Fund monies and thus are not money deducted from "wages" as required by section 302(c)(4). We disagree.

 Under the terms of the 1981 Master Agreement, all monies remitted to Lloyds that are designated as "supplemental dues"

are deducted by the employer from the appropriate employee's "wages" and appear as deductions on the employee's paychecks and tax statements, whether or not Lloyds eventually transfers those "wages" deductions to the Trust Fund or to the Union.[9] Hence, those monies sent to Lloyds are clearly money deducted from wages as required by section 302(c)(4).

Contrary to ABC's contentions, the procedures of the 1981 Master Agreement safeguard against an employer's transferring to the Union any monies as to which there is not a valid dues check-off. Payments to the Union are made by Lloyds from the account designated "supplemental dues" at such time as a precise allocation between dues and vacation and holiday benefit monies has been made and at the same time as the funds due the Trust Fund are disbursed to it.[10] The Union does not have access to the Trust Fund monies; it merely receives supplemental dues from Lloyds that would otherwise be due directly from the employees.[11]

The dues check-off procedure of section 302(c)(4) is designed to ensure not only the "protection of the employee" but also administrative convenience in the collection of dues. *NLRB v. Atlanta Printing Specialties and Paper Products Union 527,* 523 F.2d 783, 786 (5th Cir.1975); *Anheuser-Busch, Inc. v. International Brotherhood of Teamsters, Local 822,* 584 F.2d 41, 43 (4th Cir. 1978). Given the transitory nature of em-

**8.** Section 302(c)(6) of the Act, 29 U.S.C. § 186(c)(6) (Supp. II 1978), permits employers to make payments to a vacation and holiday trust fund established by a union, if and only if the payments are for the purpose of vacation and holiday benefits.

**9.** The provisions of the Trust Fund agreement themselves specifically provide that "all contributions to the fund shall be deemed to be . . . a part of the wages due to the [e]mployees."

**10.** Only the amounts actually authorized by employees to be deducted as dues are in fact transmitted to the Union as dues. An employee who does not authorize the check-off of supplemental dues from wages never in fact has any supplemental dues deducted from his wages, since the amount the employer remits to Lloyds as "supplemental dues" will eventually be received by the employee from the Trust

Fund in the form of extra holiday and vacation pay. The nonauthorizing employee also receives any interest earned on monies in the account at Lloyds during the time between the deposit of the monies in the Lloyds account and transfer of those monies to the employee's Trust Fund account.

**11.** ABC asserts on appeal that the Union uses Trust Fund assets to collect delinquent dues. This allegation does not appear in ABC's complaint nor does ABC support it with any reference to the affidavits and collective bargaining agreements in the record. Because ABC has failed to substantiate this factual assertion as required by Fed.R.App.P. 28(a)(3) and (e), we decline to consider it. *See Mitchel v. General Elec. Co.,* 689 F.2d 877, 878 (9th Cir.1982).

ployment in the construction industry, we conclude that the Union cannot be expected to provide individual authorization cards to each employer with whom an employee might work; conversely, an employer simply cannot reasonably be required to make separate deductions for dues and fringe benefits from an employee's "wages," to do the bookkeeping for such allocations, and to submit separate checks for each. To prohibit the employers in this case from designating an agent to allocate dues and fringe benefits from employee "wages" deductions would frustrate the legislative purpose of section 302(c)(4), since no other practical manner exists to ensure the remittance to the Union of those dues that employees have voluntarily and affirmatively authorized the employer to deduct.

## III

## ERISA

ABC contends that the trustees of the Trust Fund, by allowing the bank to disburse monies to the Union that are allegedly assets of the Trust Fund,[12] have failed to operate the plan solely and exclusively for the benefit of the plan's participants as required by sections 403, 404, and 406 of the ERISA, 29 U.S.C. §§ 1103, 1104, 1106 (1976). The trustees counter that ABC lacks standing to sue under the ERISA.

 Although the ERISA does not prohibit employers from suing to enforce its provisions, an employer must allege, *inter alia*, "specific and personal" injuries from violations of the ERISA in order to have standing to enforce the statute. *Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1304 (9th Cir. 1982). The trustees of the trust fund in *Fentron* refused to pay earned pension benefits to Fentron employees unless they quit Fentron and worked at least a year for another contributing employer. The fund's action threatened direct injury to Fentron.

The Trust Fund's action in this case poses no comparable threat to ABC or its member employers. Furthermore, whereas the trustees in *Fentron* unilaterally modified the criteria for disbursements from the fund in order to penalize Fentron for failing to renew a collective bargaining relationship, the ABC employers themselves bargained over and agreed to the Trust Fund arrangement, including the check-off provision.

ABC contends that the payment of union dues out of Trust Fund money decreases the vacation pay that some employees would otherwise receive and that this decrease in benefits will cause the employees to demand more fringe benefits when the next collective bargaining agreement is negotiated. All collective bargaining, however, involves compromise. In return for accepting a check-off provision that might lead to pressure from employees for increased fringe benefits, the employers in this case presumably gained something of value at the bargaining table. *See Connecticut State Federation of Teachers v. Board of Education,* 538 F.2d 471, 482 (2d Cir.1976) (citing cases). Employee demands arising from these "give-and-take" negotiations, which are characteristic of any collective bargaining relationship, are not a cognizable "injury" to the ABC employers. The employers allege as their injury putative employee dissatisfaction arising from the performance under the agreement that was bargained for. This is simply not the personal and specific injury to the employers that imparts standing under the ERISA.

## IV

## CONCLUSION

In Nos. 81–4122 and 81–4359, the appeals are dismissed. In No. 81–4687, we affirm the summary judgment against ABC and its members.

---

**12.** The trustees appear to have considerable control over the bank's disbursements to the Union. Although the employees send their authorization cards to the bank, the bank in turn sends the cards to the Trust Fund. On the basis of the authorization cards, the Trust Fund instructs the bank each month as to how much money to pay to the Union and to the Trust Fund.