**MASTER INSULATORS OF ST. LOUIS, Appellee,**

v.

**INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS, LOCAL NO. 1, Appellant.**

No. 89–1652.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1990.

Decided Feb. 14, 1991.

Paula D. Seabaugh, Clayton, Mo., for appellant.

Michael F. Harris, Chesterfield, Mo., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and STROM,* Chief

* The Honorable Lyle E. Strom, Chief Judge, United States District Court for the District of Nebraska, sitting by designation.

District Judge.

McMILLIAN, Circuit Judge.

The International Association of Heat and Frost Insulators and Asbestos Workers Local No. 1 ("the Union") appeals from a final order entered in the District Court[1] for the Eastern District of Missouri, granting summary judgment in favor of Master Insulators of St. Louis ("Master Insulators"). *Master Insulators of St. Louis v. International Association of Heat and Frost Insulators Local No. 1*, No. 87–1946C(5) (E.D.Mo. Mar. 15, 1989). Master Insulators brought the action seeking a declaratory judgment that payments to certain benefit and pension plans, administered solely by the Union, violate Section 302 of the Labor Management Relations Act of 1947 (Taft–Hartley Act) ("LMRA"), as amended, 29 U.S.C. § 186 (1988) (hereinafter Section 302). For reversal, the Union argues that the payments constitute "membership dues" collected pursuant to a valid "dues checkoff"[2] and, therefore, such payments are legal under Section 302(c)(4). For the reasons discussed below, we affirm the judgment of the district court.

## I.

Master Insulators[3] and the Union have been parties to successive collective bargaining agreements, the most recent of which was effective October 1, 1986, through September 31, 1989. Article X of the collective bargaining agreement requires Master Insulators to deduct "dues and initiation fees" from the wages of covered employees and forward the funds to the Union.[4] Each covered employee has completed forms authorizing the deduction of such amounts from his or her wages.

When the Union receives the funds, they are allocated to nine different accounts. One of these accounts is titled "Vacation, Dental, Death/Mortuary and General Welfare Benefit Fund" ("Vacation Fund"), which is a trust fund established and maintained by the Union for the purpose of providing vacation, dental, death and short-term disability benefits to its members. Another account is termed the "General Welfare Fund," which is a checking account maintained by the Union to fund apprenticeship and training programs for its members. There is also an International Apprentice Fund, which provides funds for apprentice training through the international union with which the Union is affiliated, and an IRA account.[5]

The parties have stipulated that neither Master Insulators nor any of its employer-members participate in the administration of any of the accounts, including the Vacation Fund and the General Welfare Fund. It is also stipulated that none of the accounts contains provisions for dispute resolution by an impartial umpire, nor do any provide for an annual audit and accounting. Currently, $5.09 is deducted from the wages of covered employees for each hour worked. Of this amount, $0.74 is allocated to the "Dues Account," $2.66 is allotted to the Vacation Fund, and the remainder is apportioned among the other accounts.

On October 17, 1987, Master Insulators filed a complaint seeking a declaratory judgment that the Vacation Fund administered solely by the Union is illegal because it violates Section 302. On September 15, 1988, the parties filed a Joint Stipulation of Facts. On September 19, 1988, Master Insulators amended its complaint and chal-

---

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

2. "Dues checkoff" refers to an employee's authorization to deduct dues from his or her wages.

3. Master Insulators is a corporation incorporated and doing business in the state of Missouri and is a multi-employer trade association consisting of insulating contractors doing business in the eastern district of Missouri and elsewhere.

4. *See* Agreement: Master Insulators Association and International Association of Heat and Frost Insulators and Asbestos Workers Local No. 1, St. Louis, Missouri 13 (effective Oct. 1, 1986), reproduced in Appellant's Appendix at 27.

5. The other funds and accounts include: the Building Fund, the Health Hazard Fund/Political Fund, the Dues Account and the AIM Fund.

lenged the legality of payments to the General Welfare Fund, the International Apprentice Fund and the IRA account, as well as the Vacation Fund. On October 17, 1988, Master Insulators moved for summary judgment and on November 18, 1988, the Union filed a cross-motion for summary judgment.

The district court issued a Memorandum and Order on March 15, 1989, granting summary judgment in favor of Master Insulators. The district court found that payments to the four fringe benefit accounts identified in the amended complaint do not represent "membership dues" as enumerated in Section 302(c)(4) and therefore, the accounts violate the LMRA because they do not comply with the joint administration, arbitration, annual accounting and other protective provisions of Section 302(c)(5)(B). The district court denied the Union's motion to vacate or amend the judgment and its motion to stay enforcement of the judgment. This appeal followed.

## II.

The sole issue on appeal is whether the district court erred in awarding summary judgment in favor of Master Insulators on the ground that the Union's fringe benefit accounts violate Section 302. Summary judgment is appropriate when the district court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Because this case was presented to the district court on cross-motions for summary judgment, filed under stipulated facts, we agree that one of the moving parties was entitled to judgment as a matter of law. We review the district court's

conclusions of law under a *de novo* standard. *McCuen v. Polk County,* 893 F.2d 172, 173 (8th Cir.1990).

Section 302 provides, in pertinent part, that "[i]t shall be unlawful for any employer or association of employers ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value ... to any labor organization or any officer or employee thereof." 29 U.S.C. § 186(a) (1988). In Section 302, Congress enacted a broad prohibition on employer payments to employee trust funds, unless the funds are jointly administered by representatives of the employer and employees, and conform with other specific provisions of the LMRA.[6] The LMRA also provides other exceptions to this prohibition, however, one of which includes payments from an employer to a union that constitute

> money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.

29 U.S.C. § 186(c)(4) (1988) (emphasis in original).

The Union concedes that the welfare accounts do not comply with the dual administration and other requirements of Section 302(c)(5)(B); however, it points out that, as stipulated by both parties, the wage deductions were authorized by each union employee through a "dues checkoff" in accordance with the provisions of Section 302(c)(4). The Union argues, therefore, that the accounts are simply union benefits plans funded by membership dues, which

---

**6.** The other provisions are found in Section 302(c)(5)(B), which states that

the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and the employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the

employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree upon an impartial umpire to decide such dispute ... and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection.
29 U.S.C. § 186(c)(5)(B) (1988).

are exempt from the prohibition of Section 302(a). The Union further argues that, because each of the exceptions listed under Section 302(c) is disjunctive and thereby stands on an equal statutory footing, it is immaterial that the money funds programs enumerated in Sections 302(c)(5) and (c)(6),[7] as long as the deductions comply with the provisions of Section 302(c)(4). We disagree.

The Union's argument elevates form over substance and defies common statutory construction. The legislative history of Section 302 demonstrates that Congress was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." *Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915 (1959) (footnotes omitted) (*Arroyo*). The potential for abuse includes the substantial danger that "such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain." *Id.* at 426, 79 S.Ct. at 868 (citing 92 Cong.Rec. 4892–94, 4899, 5181, 5345–46 (1946); 93 Cong.Rec. 4678, 4746–47 (1947)). In Section 302, Congress enacted specific requirements to "assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established."[8] *Arroyo,* 359 U.S. at 426, 79 S.Ct. at 868–69.

According to the Union's interpretation of Section 302, the protective provisions of Sections 302(c)(5) and (c)(6) could be avoided merely by characterizing payments to employee welfare accounts as "membership dues." Clearly, such an interpretation would defeat the congressional objective of keeping large sums of employee-earned money out of the sole control of union officers by effectively rendering these provisions inoperative. The Union's rendering of Section 302 thus violates the cardinal rule of construction that a statute should be interpreted so as to give effect to every provision. *See United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *see also* 73 Am.Jur.2d *Statutes* § 250 (1974) ("A statute should not be construed in such a manner as to render it partly ineffective or inefficient if another construction will make it effective."). It is also important to preserve the object and policy of the entire statute. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986) ("In expounding a statute, we must not be guided by a single sentence, but look to the provisions of the whole law, and to its object and policy.") (internal citations omitted).

The Union also argues that the protective mechanisms found in the dues authorization provision of Section 302(c)(4) evidence Congress' intent to exempt payments to dues-financed welfare plans, even if the welfare plans are enumerated in Sections 302(c)(5) and (c)(6).[9] We disagree. The

---

**7.** Section 302(c)(5)(A) exempts payments "held in trust for the purpose of paying ... for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity[,] ... unemployment benefits or life insurance, disability and sickness insurance, or accident insurance," subject to the provisions in subpart (B). Section 302(c)(6)(A) exempts payments to trust funds "for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs," subject to the provisions of Section 302(c)(5)(B).

**8.** *See Local Union No. 626, Bhd. of Carpenters v. Delaware Contractors Ass'n,* 344 F.Supp. 1281 (D.Del.1972) (*Delaware Contractors*), *aff'd,* 477

F.2d 564 (3d Cir.1973), which noted: "The legislative history is quite clear on this point. It states: 'By enacting a general prohibition on employer payments and then setting forth specific exceptions, Congress impliedly prohibited payments for any purpose not specifically excepted.'" *Id.* at 1285 n. 12 (quoting 1969 U.S. Code Cong. & Admin.News 1160).

**9.** In support of its argument, the Union cites a number of protective mechanisms found in dues-financed benefit plan systems, including: (1) the voluntary nature of dues authorization, (2) the democratic process in determining how union dues are spent, (3) the monitoring of union activity by the Department of Labor pursuant to the requirements of the Labor Management Reporting and Disclosure Act, (4) the un-

potential abuse associated with exclusive union control of employee welfare funds is not obviated by the authorization procedure of Section 302(c)(4). Although the "dues checkoff" procedure may be voluntary, employees are still subject to coercion by fellow employees and union officials. In addition, once the money is received by the union, there is no provision in Section 302(c)(4) to prevent union officials from using the money for improper purposes.

The Union's argument that Congress intended to distinguish between payments to a union as an entity and payments to union officials, with only the latter covered by Section 302, is equally without merit for two reasons. First, the LMRA specifically includes labor organizations in the prohibitions of Section 302(a). *See* 29 U.S.C. § 186(a)(2) (1988). Second, because union officials exercise day-to-day control over union funds, it is largely immaterial whether payments are made to the union as an entity or directly to union officials.

The Union cites a Justice Department opinion [10] and case law incorporating that opinion [11] for the proposition that "membership dues," as used in Section 302(c)(4), should be given a broad interpretation. The Union also relies on *Associated Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund*, 700 F.2d 1269 (9th Cir.) (*Associated Builders*), *cert. denied*, 464 U.S. 825, 104 S.Ct. 94, 78 L.Ed.2d 101 (1983), in which it claims the Ninth Circuit recognized both a broad construction of the term "union dues" and a union's latitude in deciding how such funds are spent. The Union's reliance on these authorities is misplaced, however. As the district court stated in the present case, "neither the Justice Department opinion nor the *Associated*

*Builders* case would allow every dues checkoff to bypass the requirements of §§ 302(c)(5) and 302(c)(6)." Slip op. at 3.

First, the Justice Department opinion addressed the criminal aspects of Section 302.[12] We have held that the rules of construction appropriate to federal criminal statutes are inappropriate in cases involving civil relief under Section 302(e), as is the case here. *See Blassie v. Kroger Co.*, 345 F.2d 58, 68 (8th Cir.1965). In addition, while the Ninth Circuit, in *Associated Builders*, acknowledged that the definition of "membership dues" was broad enough to encompass money used to combat the open shop movement in the construction industry, it specifically noted that the funds deducted for the purpose of vacation and holiday benefits were deposited into a trust fund in compliance with the requirements of Section 302(c)(6). 700 F.2d at 1277. As the court stated:

> a precise allocation between dues and vacation and holiday benefit monies has been made ... at the same time as the funds due the Trust Fund are disbursed to it. The Union does not have access to the Trust Fund monies; it merely receives supplemental dues from [the bank] that would otherwise be due directly from the employees.

*Id.* (footnotes omitted).

Although the construction of the term "membership dues," as used in Section 302(c)(4), should accommodate a union's legitimate goal of providing certain services to its members, it is the purpose of the payment and not the manner in which it is collected that determines its character. *See Communications Workers v. Beck*, 487 U.S. 735, 752 n. 7, 108 S.Ct. 2641, 2652,

---

ion's annual disclosure to the Internal Revenue Service on Form 990, and (5) the regulation of such plans by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Brief for Appellant at 22.

**10.** *See* 22 L.L.R.M. (BNA) 46, 47 (1948) ("initiation fees and assessments, being incidents of membership, should be considered as falling within the classification of 'membership dues'").

**11.** *See, e.g., International Union of Mine, Mill & Smelter Workers, Local 515 v. American Zinc,*

*Lead & Smelting Co.,* 311 F.2d 656, 660 (9th Cir.1963) (*American Zinc*); *NLRB v. Food Fair Stores, Inc.,* 307 F.2d 3, 11–12 (3d Cir.1962) (*Food Fair Stores*).

**12.** "The broad construction granted in the administration of Section 302 by the Department of Justice is consistent with the criminal character of the sanctions it embodies.'" *American Zinc,* 311 F.2d at 660 (quoting *Food Fair Stores,* 307 F.2d at 12).

n. 7, 101 L.Ed.2d 634 (1988). In the instant case, the major part of the dues checkoff is being used to finance employee welfare plans enumerated in Sections 302(c)(5) and (c)(6). We agree with the district court that "[t]o construe 'membership dues' so broadly as to include the dues checkoff for these ... funds would be to ignore the purposes of § 302." Slip op. at 3.[13]

The present case is essentially analogous to *Local Union No. 626, United Bhd. of Carpenters v. Delaware Contractors Ass'n,* 344 F.Supp. 1281 (D.Del.1972) (*Delaware Contractors* ), *aff'd,* 477 F.2d 564 (3d Cir.1973). In *Delaware Contractors,* the union sought a declaratory judgment that a vacation plan, funded by a 15 cent per hour wage deduction that was remitted directly by the employer to an interest-bearing bank account in the name of each union member, did not violate Section 302. The union argued that the requirements of Section 302(c)(6) were not applicable in that case because the payments were made to a bank, not a union representative, and that the payments constituted "wages" to the individual employees. The district court enumerated the purposes of Section 302 and rejected the union's argument because the vacation fund was under the exclusive control of the union. In conclusion, the district court stated:

This is precisely the result that Congress sought to prohibit by Section 302. The Court perceives no difference between a collective bargaining agreement obligating an employer to deduct certain sums

from union members' wages for a "General Welfare Fund" to be used as a union directs and the collective bargaining agreement here involved obligating [the employer] to deduct certain sums from union members' wages and to remit them solely *"as directed by Local 626 Vacation Plan."*

344 F.Supp. at 1286 (emphasis in original).

Although the Union here argues that *Delaware Contractors* is inapplicable to the facts in the instant case because it did not involve a dues-checkoff plan, the distinction is immaterial.[14] The analysis of a dues-financed welfare plan under Section 302 does not end with a finding that it complies with the provisions of Section 302(c)(4). We must assess the plan within the context of all the provisions in Section 302, as well as the overall purpose of the LMRA. It is also of no consequence that the present case lacks evidence of any actual abuse on the part of union officials. " 'Section 302 is aimed primarily at the prevention of possible abuse and not at providing a remedy for abuse actually perpetrated.' " *Delaware Contractors,* 344 F.Supp. at 1285 (quoting *Employing Plasterers' Ass'n v. Journeymen Plasterers' Protective & Benevolent Soc'y, Local No. 5,* 279 F.2d 92, 97 (7th Cir.1960)).

The Union further argues that regulations promulgated by the Department of Labor[15] and the Internal Revenue Service[16] indicate that these federal agencies

---

**13.** According to the collective bargaining agreement, only $0.74 of the $5.09 deducted from the hourly wage of a "Local Member" is allocated to the Dues Account, representing 14% of the total, while $2.66 is allocated to the Vacation Fund, which represents 52% of the total "dues" deduction. *See* Joint Stipulation of Facts at 7, reproduced in Appellant's Appendix at 15–16.

**14.** As the district court noted:

It is of no consequence to the decision of this Court that the union members ... authorized the collective bargaining agreements providing for the vacation plan in question. The essential purpose of [Section 302] is to keep such large sums of employee earned money out of the sole control of union officials. Once the agreements were approved the day-to-day control over the fund rested

solely with union leadership, the exact end the Act seeks to eschew.

*Delaware Contractors,* 344 F.Supp. at 1286 n. 16.

**15.** The Union points to regulations promulgated under ERISA, which govern employee welfare benefit plans, including those described in Section 302(c). *See* Definitions and Coverage Under the Employee Retirement Income Security Act of 1974, 29 C.F.R. § 2510.3–1(a)(2)(ii) (1989). For example, the Department of Labor promulgated certain reporting and disclosure requirements for the protection of participants of such plans. *See* Reporting and Disclosure Under the Employee Retirement Income Security Act of 1974, 29 C.F.R. § 2520.102–3 (1989).

**16.** The Union cites, for example, a ruling by the Internal Revenue Service that labor organizations can maintain dues-financed plans that of-

recognize the legality of dues-financed welfare plans such as exist in this case. The Union's reliance on these regulations, however, is misplaced. The Department of Labor and the Internal Revenue Service are not responsible for enforcing compliance under Section 302 and, therefore, their regulations do not address the requirements of the LMRA. In addition, Section 302(g) incorporates an exception to the requirements of Section 302(c)(5) for trust funds established prior to January 1, 1946.[17] As indicated by Section 302(g), as well as the legislative history of Section 302, Congress anticipated that pre–1946 trust funds would continue in an exempt status, despite post–1946 contributions. *See Forman Food Serv. Corp. v. Provision Salesmen Union Local 627*, 411 F.Supp. 13, 15 (S.D. N.Y.1975) ("The case law is clear that post–1946 contributions even by new employers do not destroy an otherwise valid exemption."); Annotation, *Civil Actions Involving Union Welfare Funds Subject to S. 302 of the Taft–Hartley Act*, 88 A.L.R.2d 493 (1963). These exempt trust funds would obviously be subject to regulation by the Department of Labor and the Internal Revenue Service.

### III.

We hold that payments to the General Welfare Fund, Vacation Fund, International Apprentice Fund and the IRA account do not constitute "membership dues," but rather, violate Section 302 because they fail to satisfy the joint administration, arbitration, annual accounting and other protective provisions of Section 302(c)(5)(B). Accordingly, the judgment of the district court is affirmed.

---

fer welfare and pension benefits to its members without jeopardizing their exemption under 26 U.S.C. § 501(c)(5) (1988). *See* Rev.Rul. 62–17, 1962–1 C.B. 87.

**17.** Section 302(g) states:
Compliance with the restrictions contained in subsection (c)(5)(B) upon contributions to trust funds, otherwise lawful, shall not be

applicable to contributions to such trust funds established by collective bargaining agreement prior to January 1, 1946, nor shall subsection (c)(5)(A) be construed as prohibiting contributions to such trust funds if prior to January 1, 1947, such funds contained provisions for pooled vacation benefits.
29 U.S.C. § 186(g) (1988).